# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

AMERICAN CIVIL LIBERTIES UNION;
MARK AMERIKA of ALT-X; ART ON
THE NET; FEMINIST.COM; FULL
CIRCLE BOOKS; OBGYN.NET; SANTA
FE ONLINE; SEXUAL HEALTH INSTITUTE;
STOP PRISONER RAPE; JEFF WALSH of
OASIS MAGAZINE; AMERICAN
BOOKSELLERS FOUNDATION FOR FREE
EXPRESSION; ASSOCIATION OF AMERICAN
PUBLISHERS, INC.; ELECTRONIC FRONTIER
FOUNDATION; FREEDOM TO READ
FOUNDATION, INC.; INTERNATIONAL
PERIODICAL DISTRIBUTORS ASSOCIATION;
NEW MEXICO LIBRARY ASSOCIATION;
PEN AMERICAN CENTER; PERIODICAL AND
BOOK ASSOCIATION OF AMERICA;
PUBLISHERS MARKETING ASSOCIATION;
and RECORDING INDUSTRY ASSOCIATION
OF AMERICA,

Plaintiffs,

vs.

GARY JOHNSON, in his official capacity as
Governor of the State of New Mexico; and
TOM UDALL, in his official capacity as
Attorney General of the State of New Mexico,

Defendants.

CIV 98   0474

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## PRELIMINARY STATEMENT

1.     The State of New Mexico has enacted a broad censorship law that imposes severe

restrictions on the availability, display and dissemination of constitutionally protected, non-obscene

materials on the Internet by making it a crime to use a computer communications system to

disseminate expression that involves "nudity" or "sexual conduct."  Section 1(A), 1998 New Mexico Laws, Chapter 64 (to be codified at N.M. Stat. Ann. § 30-37-3.2(A) (1978)) (hereinafter "the New Provision").  Under the New Provision, *any* nudity or sexual conduct -- including Michelangelo's David or a description of prisoner rape in a human rights document -- is criminal if communicated on the Internet and accessible in New Mexico.  Because all of the speech on the Internet is accessible in New Mexico, regardless of the geographical location of the person who posted it, the New Provision threatens Internet users nationwide and even globally.  This action seeks to have the New Provision declared facially unconstitutional and void, and to have the State enjoined from enforcing the New Provision, by reason of the First, Fifth and Fourteenth Amendments and the Commerce Clause of the United States Constitution.

      2.     The New Provision regulates speech on the Internet.  The Internet represents the most participatory marketplace of mass speech yet developed -- it is in many ways a far more speech-enhancing medium than radio or television, print, the mails, or even the village green.  Literally hundreds of millions of individuals can now engage in interactive communication on a national and global scale via computer networks that are connected to the Internet.  With a few simple tools and at a very low cost, the Internet enables average citizens to participate in local or worldwide conversations, publish an online newspaper, distribute an electronic pamphlet, and communicate with a broader audience than ever before possible.  The Internet also provides millions of users with access to a vast range of information and resources.  Internet users are far from passive listeners -- rather, they are empowered with the tools to seek out exactly the information they need and to respond with their own information if desired.

3.     Because of the way the Internet works, the New Provision's prohibition on certain communications with minors effectively would ban those same communications among adults. The New Provision targets speech that is constitutionally protected for adults, including, for example, valuable works of literature and art, cancer resources, safer sex information, examples of popular culture, and a wide range of robust human discourse about current issues and personal matters that may include provocative or sexually oriented language. There are no reasonable technological means for users of the Internet to ascertain the age of persons who access their communications, or of restricting or preventing access by minors to certain content. The New Provision will thus reduce the adult population in cyberspace to reading and communicating only material that is suitable for young children. In addition, the New Provision prohibits speech that is valuable and constitutionally protected for minors, especially older minors.

4.     The speech at issue in this case does not include obscenity, child pornography, speech used to entice or lure minors into inappropriate activity, or harassing speech.

5.     Plaintiffs represent a broad range of individuals and entities who are speakers, content providers and access providers on the Internet. Plaintiffs post and discuss content including resources on obstetrics, gynecology, and sexual health; visual art and poetry; literature about sexual abuse and feminist issues; the problem of prisoner rape; and resources for gay and lesbian youth. The New Provision directly violates the First Amendment rights of plaintiffs, their members, their users, and tens of millions of other speakers and users of the Internet.

6.     In addition, the New Provision violates the Commerce Clause because it regulates commerce occurring wholly outside of the State of New Mexico, because it imposes an impermissible burden on interstate and foreign commerce, and because it subjects interstate use of the Internet to

3

inconsistent state regulations. Because an online user cannot know whether someone in New Mexico might download her content posted on the Web from an out-of-state computer, the user must comply with New Mexico law or face criminal prosecution.

## JURISDICTION AND VENUE

7.     This case arises under the United States Constitution and the laws of the United States and presents a federal question within this Court's jurisdiction under Article III of the federal Constitution and 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3). This action is brought pursuant to 42 U.S.C. § 1983.

8.     The Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.

9.  The Court has the authority to award costs and attorneys' fees under 42 U.S.C. § 1988.

10.    Venue is proper in the district under 28 U.S.C. § 1391(b).

## THE PARTIES

11.    Plaintiff AMERICAN CIVIL LIBERTIES UNION ("ACLU") is a nationwide, nonpartisan organization of nearly 300,000 members dedicated to defending the principles of liberty and equality embodied in the Bill of Rights. The ACLU is incorporated in the District of Columbia and has its principal place of business in New York City. The ACLU sues on its own behalf, on behalf of others who use its online computer communications systems, and on behalf of its members who use online computer communications systems.

12.    Plaintiff MARK AMERIKA is a critically acclaimed writer and publisher of ALT-X, a Web site containing original literary works published only online, reviews of new media art and theory, original online art projects, and the GRAMMATRON Project (a "public domain narrative

environment" developed by Amerika in conjunction with the Brown University Graduate Creative Writing Program and the National Science Foundation's (NSF) Graphics and Visualization Center). ALT-X has been called "the literary publishing model of the future." Mr. Amerika resides in Boulder, Colorado. Mr. Amerika sues on his own behalf and on behalf of users of the ALT-X Web site.

13.    Plaintiff ART ON THE NET ("art.net") is a not-for-profit international artist site on the World Wide Web. Based in Menlo Park, California, Art on the Net assists over 125 artists in maintaining online studio or gallery spaces. In addition, Art on the Net hosts mailing lists for artistic communities regarding relevant issues and events and posts information about art events and artist shows. Art on the Net sues on its own behalf, on behalf of the artists who utilize its site and on behalf of users of its service.

14.    Plaintiff FEMINIST.COM is a corporation that promotes networking among women through its free site on the World Wide Web. The Feminist.com Web site offers a searchable nationwide database of women's services, an interactive question-and-answer column, weekly news updates and action alerts on women's issues, women's health resources, classified ads, and hundreds of links to other web sites of interest to women. Feminist.com is incorporated in Delaware and has its principal place of business in New York, New York. Feminist.com sues on its own behalf, and on behalf of users of its Web site.

15.    Plaintiff FULL CIRCLE BOOKS is one of oldest and largest feminist bookstores in North America. In addition to its large bookstore in Albuquerque, New Mexico, Full Circle Books has an extensive site on the World Wide Web. Full Circle Books has its principal place of business in Albuquerque, New Mexico.

5

16.     Plaintiff OBGYN.NET is a free comprehensive international online resource center for professionals in Obstetrics and Gynecology, the medical industry, and the women they serve. OBGYN.net offers up-to-the-minute reference information, an event calendar, clinical reference collections, powerful search tools, discussion forums, electronic journals, and a place for physicians to publish articles. OBGYN.net is a service and publication that has its principal place of business in Austin, Texas, and that is wholly owned by Elecomm Corporation, which is incorporated in Texas.

17.     Plaintiff SANTA FE ONLINE is an Internet Service Provider located in Santa Fe, New Mexico. Santa Fe Online provides access to the Internet to approximately 200 individual and business subscribers throughout Santa Fe and the surrounding area. Santa Fe Online also provides World Wide Web site maintenance, file storage, and server support to organizations that seek to put information on the World Wide Web. Santa Fe Online sues on its own behalf and on behalf of its subscribers and other users of its services.

18.     Plaintiff SEXUAL HEALTH INSTITUTE, owned and operated by Melinda Masters, has maintained a business license in Santa Fe, New Mexico since 1995 with the goal of providing quality sexual education and treatment for adults in New Mexico. Melinda Masters is a licensed independent social worker and professional clinical counselor in the State of New Mexico. Ms. Masters is also a certified sexologist who has received several awards for her services and presentations. The Sexual Health Institute began in February 1998 to develop a site on the World Wide Web to offer information and services online. The Web site is expected to be available within the next month.

19.     Plaintiff STOP PRISONER RAPE ("SPR") is a nonprofit organization dedicated to combating the problem of prisoner rape, and has an extensive educational site on the World Wide

Web.  SPR is a non-profit corporation incorporated in New York and has its principal place of business in Los Angeles, California.  It sues on its own behalf and on behalf of those who use its online computer communications.

20.    Plaintiff JEFF WALSH is a writer and editor of Oasis Magazine, a monthly online magazine for lesbian, gay, bisexual and questioning youth.  Oasis Magazine includes news, book and cultural reviews, and safer sex advice columns written by and for gay and lesbian youth.  Mr. Walsh resides in San Francisco, California.

21.    Plaintiff AMERICAN BOOKSELLERS FOUNDATION FOR FREE EXPRESSION ("ABFFE") was organized as a not-for-profit organization by the American Booksellers Association in 1990 to inform and educate booksellers, other members of the book industry, and the public about the dangers of censorship and to promote and protect the free expression of ideas, particularly freedom in the choice of reading materials.  ABFFE is incorporated in Delaware, and has its principal place of business in New York City.  ABFFE, most of whose members are bookstores in the United States, sues on its own behalf, on behalf of its members who use online computer communications systems, and on behalf of the patrons of their member bookstores.

22.    Plaintiff ASSOCIATION OF AMERICAN PUBLISHERS, INC. ("AAP") is the national association in the United States of publishers of general books, textbooks, and educational materials.  Its approximately 200 members include most of the major commercial book publishers in the United States and many smaller or non-profit publishers, including university presses and scholarly associations.  AAP's members publish a substantial portion of the general, educational, and religious books produced in the United States and are active in all facets of the electronic medium, including publishing a wide range of electronic products and services.  AAP is incorporated in New York, and

7

has its principal places of business in New York City and in the District of Columbia.  AAP sues on its own behalf, on behalf of its members who use online computer communications systems, and on behalf of the readers of its members' books.

23.    Plaintiff ELECTRONIC FRONTIER FOUNDATION ("EFF") is a nationwide, nonpartisan organization of approximately 2,000 paying individual members that is committed to defending civil liberties in the world of computer communications, to developing a sound legal framework for that world, and to educating government, journalists, and the general public about the legal and social issues raised by this new medium.  EFF is incorporated in California and has its principal place of business in San Francisco.  EFF sues on its own behalf, on behalf of others who use its online computer communications, and on behalf of its members.

24.    Plaintiff FREEDOM TO READ FOUNDATION, INC. ("FTRF") is a non-profit membership organization established in 1969 by the America Library Association to promote and defend First Amendment rights; to foster libraries as institutions fulfilling the promise of the First Amendment for every citizen; to support the rights of libraries to include in their collections and make available to the public any work they may legally acquire; and to set legal precedent for the freedom to read on behalf of all citizens.  FTRF is incorporated in Illinois and has its principal place of business in Chicago.  FTRF sues on its own behalf, on behalf of its members who use online computer communications systems, and on behalf of the patrons of its member libraries.

25.    Plaintiff INTERNATIONAL PERIODICAL DISTRIBUTORS ASSOCIATION ("IPDA") is the trade association for the principal national periodical distributors engaged in the business of distributing or arranging for the distribution of paperback books and periodicals to wholesalers throughout the United States for ultimate distribution to retailers and the public.  IPDA

is incorporated in New York, and has its executive offices in Allentown, Pennsylvania. IPDA sues on its own behalf, on behalf of its members who use computer communications systems, and on behalf of readers of publications distributed by its members.

26.     Plaintiff NEW MEXICO LIBRARY ASSOCIATION ("NMLA") is a nonprofit organization dedicated to the support and promotion of libraries and library personnel as well as advancing the use and understanding of libraries and information services. NMLA has approximately 570 members affiliated with academic, public and school libraries, including libraries and librarians, trustees, support staff, and students. In addition, the NMLA maintains its own site on the World Wide Web, and has a mailing list that is used for association business. NMLA sues on behalf of its members who use computer communications systems and patrons of their member libraries.

27.     Plaintiff PEN AMERICAN CENTER is a non-profit association of poets, playwrights, essayists, editors, and novelists with 2,700 members. Its mission is to advance the cause of literature and defend free expression of the written word. To achieve this, PEN American Center sponsors public literary events, literary awards, outreach projects to encourage reading, and international and domestic human rights campaigns on behalf of the many writers, editors, and journalists censored, persecuted, or imprisoned because of their writing. PEN American Center is incorporated in New York and has its principal place of business in New York City. PEN American Center sues on its own behalf, on behalf of its members who use computer communications systems and on behalf of the readers of its members' publications.

28.     Plaintiff PERIODICAL AND BOOK ASSOCIATION OF AMERICA ("PBAA") is an association of magazine and paperback book publishers who distribute magazines and books through independent national distributors, wholesalers and retailers throughout the United States and

Canada, for ultimate sale to the public, principally at newsstands.  PBAA is incorporated in New

York, and has its principal office in New York City.  PBAA sues on its own behalf, on behalf of its

members who use computer communications systems, and on behalf of readers of its members'

publications.

29.     Plaintiff PUBLISHERS MARKETING ASSOCIATION ("PMA") is a nonprofit trade

association representing more than 2,000 publishers across the United States and Canada.  The PMA

represents predominantly nonfiction publishers and assists members in their marketing efforts to the

trade.  PMA is incorporated in California, and has its principal office in Manhattan Beach, California.

PMA sues on its own behalf, on behalf of its members who use computer communications systems,

and on behalf of readers of its members' publications.

30.     Plaintiff RECORDING INDUSTRY ASSOCIATION OF AMERICA, INC. ("RIAA")

is a trade association whose member companies produce, manufacture and distribute over 90% of the

sound recordings sold in the United States.  The RIAA is committed to protecting the free expression

rights of its member companies.  RIAA is incorporated in New York, and has its principal office in

the District of Columbia.  RIAA sues on its own behalf, on behalf of its members who use computer

communications systems, and on behalf of listeners to its members' recordings.

31.     Defendant GARY JOHNSON is the Governor of the State of New Mexico.  As the

Governor, Johnson is vested with the executive power of the State of New Mexico and must take

care that the laws of the State of New Mexico are faithfully executed.  Pursuant to this executive

power, Johnson signed the New Provision into law on March 9, 1998.

32.     Defendant TOM UDALL is the Attorney General of the State of New Mexico.  Udall

is the chief law officer of the State of New Mexico and, as such, has the duty and responsibility for

the enforcement of the laws of the State of New Mexico.  He also retains general prosecutorial authority to ensure that the laws are faithfully executed.

**FACTS**

**The Internet**

33.     The Internet is a decentralized, global medium of communication that links people, institutions, corporations and governments around the world.  It is a giant computer network that interconnects innumerable smaller groups of linked computer networks and individual computers. While estimates are difficult due to its constant and rapid growth, the Internet is currently believed to connect more than 159 countries and over 100 million users. The amount of traffic on the Internet is doubling approximately every 100 days.

34.     Because the Internet merely links together numerous individual computers and computer networks, no single entity or group of entities controls the material made available on the Internet or limits the ability of others to access such materials.   Rather, the range of digital information available to Internet users -- which includes text, images, sound and video -- is individually created, maintained, controlled and located on millions of separate individual computers around the world.

35.     The Internet presents extremely low entry barriers to anyone who wishes to provide or distribute information or gain access to it.  Unlike television, cable, radio, newspapers, magazines or books, the Internet provides the average citizen with an affordable means for communicating with, accessing and posting content to a worldwide audience.

36.     The Internet is an invaluable information source and communication tool which is used by millions of users in innumerable ways.  Minors, for example, use the Internet to do school homework, seek information, play games and communicate with others.

37.     There are also computer communications systems that are independent of the Internet. For example, computer bulletin board systems ("BBSs") are stand-alone computer systems that allow subscribers to dial directly from their computers into a BBS host computer.  BBSs generally offer their users a variety of information services, including e-mail, online discussion groups, and information databases.  BBSs generally serve people interested in specialized subject matter or people from a particular geographic region.

**How Individuals Access the Internet**

38.     Individuals have several easy means of gaining access to computer communications systems in general, and to the Internet in particular.  Many educational institutions, businesses, and individual communities maintain a computer network linked directly to the Internet and provide account numbers and passwords enabling users to gain access to the network.

39.     Many libraries provide their patrons with free access to the Internet through computers located at the library; some libraries also host online discussion groups and chat rooms.  Many libraries also post their card catalogs and online versions of material from their collections.

40.     Internet service providers ("ISPs") allow subscribers to dial onto the Internet by using a modem and a personal computer to access computer networks that are linked directly to the Internet.  Most ISPs charge a monthly fee ranging from $15-50 monthly, but some provide free or very low-cost access.

41.     National "commercial online services," such as America Online, CompuServe, Prodigy, and Microsoft Network, serve as ISPs and also provide subscribers with additional services, including access to extensive content within their own proprietary networks.

42.     There are also "cyberspace cafés," where customers, for a small hourly fee, can use computers provided by the café to access the Internet.

## Ways of Exchanging Information on the Internet

43.     Most users of the Internet are provided with a username, password and e-mail address that allow them to log on to the Internet and to communicate with other users.  Many usernames are pseudonyms or pen names that often provide users with a distinct online identity and help to preserve their anonymity and privacy.  America Online allows every subscriber to use up to six different "screen names," which may be used for different family members or for separate pseudonyms by an individual.  The username and e-mail address are the only indicators of the user's identity; that is, persons communicating with the user will only know them by their username and e-mail address (unless the user reveals other information about herself through her messages).

44.     Once an individual signs on to the Internet, there are a wide variety of methods for communicating and exchanging information with other users.

### E-Mail

45.     The simplest and perhaps most widely used method of communication on the Internet is via electronic mail, commonly referred to as "e-mail."  Using one of dozens of available "mailers" -- software capable of reading and writing an e-mail -- a user is able to address and transmit via computer a message to a specific individual or group of individuals who have e-mail addresses.

13

### Discussion Groups, Mailing Lists, and Chat Rooms

46.     Another of the most popular forms of communication over computer networks are online discussion groups.  Discussion groups allow users of computer networks to post messages onto a public computerized bulletin board and to read and respond to messages posted by others in the discussion group.  Discussion groups have been organized on many different computer networks and cover virtually every topic imaginable.  Discussion groups can be formed by individuals, institutions or organizations, or by particular computer networks.

47.     "USENET" newsgroups are a very popular set of bulletin board discussion groups available on the Internet and other networks.  There are currently USENET newsgroups on more than 15,000 different subjects, and over 100,000 new messages are posted to these groups each day.

48.     Similarly, users also can communicate within a group by subscribing to automated electronic mailing lists that allow any subscriber to a mailing list to post a particular message that is then automatically distributed to all of the other subscribers on that list.  These lists are sometimes called "mail exploders" or "listservs."

49.     "Chat rooms" also allow users to engage in simultaneous conversations with another user or group of users by typing messages and reading the messages typed by others participating in the "chat."  Chat rooms are available on the Internet, commercial online services, and local BBSs.  Although chat rooms are often set up by particular organizations or networks, any individual user can start an online "chat."

50.     Online discussion groups, mailing lists, and chat rooms create an entirely new global public forum -- analogous to the village green -- where individuals can associate and communicate

with others who have common interests, and engage in discussion or debate on every imaginable topic.

### The World Wide Web

51.     The World Wide Web ("Web") is the most popular way to provide and retrieve information on the Internet. Anyone with access to the Internet and proper software can create "Web pages" or "home pages" which may contain many different types of digital information -- text, images, sound, and even video. The Web comprises millions of separate "Web sites" that display content provided by particular persons or organizations. Any Internet user anywhere in the world with the proper software can create her own Web page, view Web pages posted by others, and then read text, look at images and video, and listen to sounds posted at these sites.

52.     The Web was created to serve as a global, online repository of knowledge, containing information from a diverse array of sources, which is easily accessible to Internet users around the world. Though information on the Web is contained on individual computers, each of these computers is connected to the Internet through Web protocols that allow the information on the Web to become part of a single body of knowledge accessible by all Web users.

53.     Many large corporations, banks, brokerage houses, newspapers and magazines now provide online editions of their publications and reports on the Web or operate independent Web sites. Many government agencies and courts also use the Web to disseminate information to the public. For example, the United States District Court for the District of New Mexico is one of the first federal district courts to offer comprehensive electronic services over the Internet, including electronic document filing and World Wide Web access to court records such as opinions, calendars, docket sheets, and pleadings. In addition, many individual users and small community organizations

have established individualized home pages on the Web that provide information of interest to members of the particular organization, communities, and to other individuals.

54.     To gain access to the information available on the Web, a person uses a Web "browser" -- software, such as Netscape Navigator, Mosaic, or Internet Explorer -- to display, print and download documents that are formatted in the standard Web formatting language.  Each document on the Web has an address that allows users to find and retrieve it.

55.     Most Web documents also contain "links."  These are short sections of text or image that refer and link to another document.  Typically the linked text is blue or underlined when displayed, and when selected by the user on her computer screen, the referenced document is automatically displayed, wherever in the world it actually is stored.  Links, for example, are used to lead from overview documents to more detailed documents on the same Web site, from tables of contents to particular pages, and from text to cross-references, footnotes, and other forms of information.  For example, plaintiff ACLU's Web page provides links to several other Web pages also offered by the ACLU, including issue pages such as "Immigrants" and "Lesbian and Gay Rights," as well as advocacy pages such as "In Congress" and "In the Courts."

56.     Links may also take the user from the original Web site to another Web site on a different computer connected to the Internet.  For example, plaintiff ACLU has a Web page about its Reproductive Freedom Project which also includes links to similar resources elsewhere on the Web, including the Web pages of Planned Parenthood and the National Organization of Women. While linking to these Web sites from the ACLU Web site appears seamless from the user's point of view, in fact these Web sites are each located on entirely separate computers that are not maintained or controlled by the ACLU.

57.     Through the use of these links from one computer to another, from one document to another, the Web for the first time unifies the diverse and voluminous information made available by millions of users on the Internet into a single body of knowledge that can be searched and accessed.

58.     A number of "search engines" -- such as Yahoo, Infoseek, Alta Vista, WebCrawler, and Lycos -- are available free of charge to help users navigate the World Wide Web. Once a user has accessed the search service, she simply types a word or string of words as a search request and the search engine provides a list of sites that match the search string.

59.     As can be seen from the various ways that individuals can exchange information and communicate via this new technology, the Internet is "interactive" in ways that distinguish it from traditional media. For instance, users are not passive receivers of information as with television and radio; rather, a user can easily respond to the material she receives or views online. In addition, "interactivity" means that Internet users must actively seek out with specificity the information they wish to retrieve and the kinds of communications in which they wish to engage. For example, a user wishing to read articles posted to a newsgroup must log on to the Internet and then connect to a USENET server, select the relevant group, review the relevant header lines -- which provide brief content descriptions -- for each message, and then access a particular message to read its content. Similarly, to gain access to material on the World Wide Web, a user must know and type the address of a relevant site or find the site by typing a relevant search string in one of several available search engines.

**The Range of Content Available on the Internet**

60.     The information made available on the Internet is as diverse as human thought.
Content on the Internet is provided by the millions of Internet users worldwide, and the content
ranges from academic writings, to humor, to art, to literature, to medical information, to music, to
news, and to human sexuality.  For example, on the Internet, one can view the full text of the Bible,
all of the works of Shakespeare, and numerous other classic works of literature.  One can browse
through paintings from museums around the world, view in detail images of the ceiling of the Sistine
Chapel, or see the latest photographs transmitted by the Jupiter space probe.  At any one time, the
Internet serves as the communication medium for literally tens of thousands of global conversations,
political debates, and social dialogues.

61.     Although the overwhelming majority of the information on the Internet does not
involve nudity or sexual conduct, there is such material available on the Internet.  For example, an
Internet user can read online John Cleland's eighteenth-century novel *Fanny Hill:  Memoirs of a
Woman of Pleasure*; view the digital photography of Diane Fenster; receive instructions from the
AIDS organization ACT UP on how to practice safer sex; share experiences of breast cancer with
other survivors in an online discussion group; and exchange e-mail about your favorite new rap lyric.
Much of this material is similar, if not identical, to material that is routinely discussed in cafés and on
street corners, and that is distributed through libraries, bookstores, record stores, and newsstands.

**The Statutory Language at Issue**

62.     In 1998, the New Mexico Senate and State Assembly amended Chapter 30, Article
37, of the New Mexico Penal Law, by adding a new section to be codified at N.M. Stat. Ann. § 30-

37-3.2(A) (1978) ("the New Provision").  The New Provision was signed by Governor Gary Johnson

on March 9, 1998, and will become effective on July 1, 1998.

   63.  The New Provision is entitled "Dissemination of material that is harmful to a minor

by computer--child luring," and reads:

> Dissemination of material that is harmful to a minor by computer
> consists of the use of a computer communications system that allows
> the input, output, examination or transfer of computer data or
> computer programs from one computer to another, to knowingly and
> intentionally initiate or engage in communication with a person under
> eighteen years of age when such communication in whole or in part
> depicts actual or simulated nudity, sexual intercourse or any other
> sexual conduct.  Whoever commits dissemination of material that is
> harmful to a minor by computer is guilty of a misdemeanor.

N.M. Stat. Ann. § 30-37-3.2(A)(1978).

   64.  Violation of the New Provision is punishable by imprisonment up to one year, or a fine

of up to $1,000, or both.  N.M. Stat. Ann. § 31-19-1(A) (1978).

   65.  Section 30-37-1 of the New Mexico Statutes Annotated provides the following

definitions, "as used in this act":

> A.  "nudity" means the showing of the male or female genitals, pubic area
> or buttocks with less than a full opaque covering, or the depiction of
> covered male genitals in a discernibly turgid state;
>
> B.  "sexual conduct" means act of masturbation, homosexuality, sodomy,
> sexual intercourse or physical contact with a person's clothed or
> unclothed genitals, pubic area, buttocks or, if such person be female,
> breast;

   66.  The annotation in the New Mexico Statutes Annotated which appears below § 30-37-

1 reads:

MEANING OF "THIS ACT". -- The term "this act" means Laws 1973, Chapter 257, which appears as 30-37-1, 30-37-2, 30-37-3, 30-37-4 to 30-37-8 NMSA 1978.

67.      The definitions of "nudity" and "sexual conduct" in § 30-37-1 do not apply to the use of those terms in the New Provision (to be codified at § 30-37-3.2) because § 30-37-3.2 is not included in the definition of "this act," as acknowledged by the annotation to § 30-37-1.

68.      The term "sexual intercourse," which is used in the New Provision, is not defined in the New Mexico Statutes Annotated.

69.      Section 30-37-5(D) of the New Mexico Statutes Annotated states: "No person shall be guilty of violating the provisions of this act . . . where such person is a bona fide school, museum or public library, or is acting in his capacity as an employee of such organization, or as a retail outlet affiliated with and serving the educational purposes of such organization."  This defense does not apply to the New Provision (to be codified at § 30-37-3.2) because § 30-37-3.2 is not included in the definition of "this act," as acknowledged by the annotation to § 30-37-1.

70.      Section 30-37-2(A) of the New Mexico Statutes Annotated prohibits the sale to minors of images that depict "nudity, sexual conduct, sexual excitement or sado-masochistic abuse and which is harmful to minors."  Section 30-37-2(B) of the New Mexico Statutes Annotated prohibits the sale to minors of books and magazines that contain "descriptions or narrative accounts of sexual excitement, sexual conduct or sado-masochistic abuse and which, taken as a whole, is harmful to minors."  Section 30-37-3 prohibits the exhibition to minors of motion pictures or shows that depict "nudity, sexual conduct or sado-masochistic abuse and which is harmful to minors." "Harmful to minors" is then further defined in Section 30-37-1 as follows:

F. "harmful to minors" means that quality of any description of [sic] representation, in whatever form, of nudity, sexual conduct, sexual excitement or sado-masochistic abuse, when it:

(1) predominantly appeals to the prurient, shameful or morbid interest of minors; and

(2) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and

(3) is utterly without redeeming social importance for minors;

71.     The definition of "harmful to minors" provided in § 30-37-1 does not apply to the New Provision.  Unlike §§ 30-37-2 and 30-37-3, the New Provision does not require the prohibited communications of "nudity" and "sexual conduct" also to be "harmful to minors" as defined in § 30-37-1.  The New Provision therefore directly applies to *all* depictions of nudity or sexual conduct, including depictions that have social importance for minors, that are not patently offensive, and that do not appeal to the prurient interest of minors.

72.     Speech on the Internet is generally available to anyone with access to this technology. Anyone who posts content to the World Wide Web, chat rooms, mailing lists, and discussion groups makes it automatically available to all users worldwide, including minors.  Because minors have access to all of these forums, any communication in these forums could be subject to the New Provision because it constitutes "use of any computer communications system . . . [to] initiate or engage in communication with a person under eighteen years of age."

73.     The New Provision also applies to both commercial and non-commercial dissemination of material, and thus specifically applies to libraries, educational institutions, and non-profit organizations.

21

74.     Even if some depictions of nudity and sexual conduct may be considered by some to

be inappropriate for younger minors, many depictions -- including safer sex resources, books such

as *Madame Bovary*, and paintings by Botticelli -- are valuable, at least for older minors.

75.     Section C of the law containing the New Provision (to be codified at § 30-37-3.2(C))

states that:

> In a prosecution for dissemination of material that is harmful to a
> minor by computer, it is a defense that the defendant has:
>
> (1)     in good faith taken reasonable, effective and
>         appropriate actions under the circumstances to restrict
>         or prevent access by minors to indecent materials on
>         computer, including any method that is feasible with
>         available technology;
>
> (2)     restricted access to indecent materials by requiring the
>         use of a verified credit card, debit account, adult
>         access code or adult personal identification number; or
>
> (3)     in good faith established a mechanism such as labeling,
>         segregation or other means that enables the indecent
>         material to be automatically blocked or screened by
>         software or other capability reasonably available to
>         persons who wish to effect such blocking or screening
>         and the defendant has not otherwise solicited a minor
>         not subject to such screening or blocking capabilities
>         to access the indecent material or to circumvent
>         screening or blocking.

76.     The New Provision does not define the term "indecent" used throughout Section C

of the law containing the New Provision, and there is no definition of "indecent" elsewhere in the

New Mexico Penal Code.  It is not clear whether "indecent" material is the same as material that

depicts "nudity" or "sexual conduct."

77.     Section D of the law containing the New Provision (to be codified at § 30-37-3.2(D)) states:

> In a prosecution for dissemination of material that is harmful to a minor by computer, a person shall not be held to have violated the provisions of this section solely for providing access or connection to or from a facility, system or network not under the person's control, including transmission, downloading, intermediate storage, access software or other related capabilities that are incidental to providing access or connection and that do not include the creation of the content of the communication.

An exception to this defense for conspiracies and co-ownership is set out in Section E of the law containing the New Provision, and an employer liability defense is set out in Section F of the law (to be codified at § 30-37-3.2(E) and § 30-37-3.2(F), respectively).

**The New Provision's Impact on Internet Speech**

78.     Because of the nature of the Internet, the New Provision will ban certain constitutionally protected speech among adults.

79.     Most of the millions of users on the Internet are speakers and content providers subject to the terms of the New Provision. Anyone who sends an e-mail, participates in a discussion group or chat room, or maintains a home page on the World Wide Web is subject to the New Provision because their communication might be accessed by a minor in the State of New Mexico. Given the technology of the Internet, there are no reasonable means for these speakers to ascertain the age of persons who access their messages, or of restricting or preventing access by minors to certain content. From the perspective of these speakers, the information that they make available on the public spaces of the Internet must either be made available to all users of the Internet, including users who may be minors, or not made available at all.

80.     For instance, when a user posts a message to a USENET discussion group, it is automatically distributed to hundreds of thousands of computers around the world, and the speaker has no ability to control who will access her message from those computers.  Similarly, users who communicate on mailing lists have no way to determine the ages of other subscribers to the list. Finally, the overwhelming majority of content providers on the World Wide Web have no way to verify the age of persons who access their Web sites.  Although some commercial content providers could require their users to provide a credit card before obtaining information, this option is simply not practical for the majority of Web sites, whether commercial or non-commercial.

81.     Similarly, the vast majority of speakers on the Internet also lack any mechanism for labeling or segregating specific communications -- whether distributed by e-mail, discussion groups, mailing lists, chat rooms or Web sites -- in a way that would enable those communications to be automatically blocked or screened from minors by software or other capabilities.

82.     Even if age verification, screening, or segregation were technologically or economically feasible, such requirements would fundamentally alter the nature and values of the new computer communications medium, which is characterized by spontaneous, instantaneous, albeit often unpredictable, communication by hundreds of thousands of individual speakers around the globe and provides an affordable and often seamless means of accessing an enormous and diverse body of information, ideas and viewpoints.  Pre-registration or screening requirements would undermine the unique characteristics of this new technology.

83.     For these reasons, there is no practical way for content providers to keep materials containing nudity or sexual conduct from minors on the Internet.  Thus, none of the defenses in the

New Provision offer an effective and reasonable means for the plaintiffs to insulate themselves from criminal liability under the New Provision.

84.    In addition, the New Provision's age verification and identification requirements would make it impossible for online users to engage in constitutionally protected anonymous speech on matters of public and private importance.

85.    Because it is technologically and economically infeasible for the majority of Internet speakers to restrict minors from New Mexico from accessing their communications, the New Provision effectively would require almost all discourse on the Internet -- whether among New Mexicans or among users anywhere in the world -- to be at a level suitable for young children.  The New Provision therefore would ban an entire category of constitutionally protected speech between and among adults on the Internet.

**The New Provision's Burden on Interstate Commerce**

86.    The New Provision will impact speech across the entire Internet -- not just in the State of New Mexico -- because it is impossible for Internet users to determine the geographic location of persons who access their information.  An Internet user has no way to determine whether information posted to the World Wide Web, discussion groups or chat rooms will be accessed by persons residing in the State of New Mexico.  The various sites on the Internet can be accessed by anyone in the world, and therefore there is no way for speakers to ensure that New Mexicans will not view their communications.  Thus, all users, even if they do not reside in New Mexico or intend to communicate with New Mexicans, must comply with the terms of the New Provision.

87.    The New Provision will unjustifiably burden interstate commerce and regulate conduct that occurs wholly outside the State.  The New Provision will chill speakers outside of New Mexico

and speech that occurs wholly outside the borders of New Mexico. Like the nation's railways and highways, the Internet is by nature an instrument of interstate commerce. Just as goods and services travel over state borders by truck and train, information flows across state borders on the Internet. Internet content providers, such as plaintiffs Art on the Net and Oasis Magazine, which are located outside of New Mexico, have no feasible way to determine whether their information will be accessed or downloaded by someone who is located in New Mexico. Just as a user of the Internet cannot identify the age of another user of the Internet, one also cannot identify where a particular user or speaker resides, or from where a particular user may be accessing or downloading information on the Internet. Due to the nature of the technology, a non-New Mexican will be forced to self-censor her speech on the Internet if she wishes to comply with the New Provision. If she does not, she risks the possibility that a minor from New Mexico will gain access to this information and that she will be subjected to prosecution in New Mexico. Therefore, the New Provision will interfere significantly with the interstate flow of information and likewise with interstate commerce.

88.      Moreover, interstate and international computer communications networks -- just like the nation's railroads -- constitute an area of the economy and society that particularly demands uniform rules and regulations. If each state implements its own regulations, as New Mexico has done, regarding what information can be legally distributed via this new technology, interstate commerce will be greatly inhibited and disrupted as persons around the world try to discern what can and cannot be communicated in the many different jurisdictions connected to these networks.

**The Ineffectiveness of the New Provision and the Effectiveness of Alternative Means**

89.      Because of the global nature of the Internet, defendants cannot demonstrate that the New Provision would likely reduce the availability of materials depicting nudity or sexual conduct on the Internet to minors in New Mexico.

90.     As of May 1996, at least 40% of the content provided on the Internet originated abroad. All of the content on the global Internet is equally available to all Internet users worldwide and may be accessed as easily and as cheaply as content that originates locally. Because it is not technologically possible to prevent content posted abroad from being available to Internet users in the State of New Mexico, the New Provision will not accomplish its purported purpose of keeping inappropriate content from minors in New Mexico. In addition, adult-oriented content providers in the United States could simply circumvent the New Provision by moving their content to sites located abroad.

91.     Conversely, there are many alternative means that are more effective at assisting parents in limiting a minor's access to certain material if desired.

92.     Commercial online services like America Online, Prodigy, and CompuServe provide features that subscribers may use to prevent children from accessing chat rooms and to block access to Web sites and newsgroups based on keywords, subject matter, or specific newsgroup. These services also offer screening software that blocks messages containing certain words, and tracking and monitoring software to determine which resources a particular online user (e.g., a child) has accessed. They also offer children-only discussion groups that are closely monitored by adults.

93.     Online users can also purchase special software applications, known as user-based blocking programs, that enable them to control access to online resources. These applications allow users to block access to certain resources, to prevent children from giving personal information to strangers by e-mail or in chat rooms, and to keep a log of all online activity that occurs on the home computer.

94.     User-based blocking programs are not perfect, both because they fail to screen all inappropriate material and because they inadvertently block valuable Internet sites. However, a

voluntary decision by concerned parents to use these products for their children constitutes a far less restrictive alternative than the New Provision's imposition of criminal penalties for protected speech.

**Relationship of Plaintiffs to the New Provision**

95.     Plaintiffs (and the plaintiffs' members, subscribers, patrons, and customers) interact with and use the Internet in a wide variety of ways, including as content providers, access providers, and users. The New Provision burdens plaintiffs in all of these capacities.

96.     Plaintiffs who are users and content providers are expressly subject to the New Provision. These plaintiffs fear prosecution under the New Provision for communicating, sending, displaying, or distributing material that depicts nudity or sexual conduct. They also fear liability for material posted by others to their online discussion groups, chat rooms, mailing lists, and Web sites. Plaintiffs have no way to comply with the New Provision and are left with two equally untenable alternatives: (i) risk prosecution under the New Provision, or (ii) attempt to engage in self-censorship and thereby deny adults and older minors access to constitutionally protected material.

97.     Plaintiffs who are access providers, including Santa Fe Online, are expressly subject to the New Provision. Many plaintiffs, including members of plaintiff New Mexico Library Association, provide both content on the Internet and access to the Internet. These plaintiffs are unclear how their dual role will affect their liability under the New Provision. Although the law containing the New Provision provides a limited defense for access providers, plaintiffs who are access providers reasonably fear that the defense will not be construed and applied as broadly as is necessary to protect their rights, and they fear they may be directly subject to prosecution under the New Provision.

98.     Plaintiffs who are libraries or employees of libraries, including New Mexico Library Association and Freedom to Read Foundation, fear that they are directly subject to the New

Provision. They fear that the library defense provided in § 30-37-5(D) of the New Mexico Statutes Annotated does not apply to the New Provision, for the reason stated in paragraph 69. In addition, they fear that the defense may apply only to a library's provision of its own content over the Internet, and not to circumstances in which a library provides its patrons with access to content posted by others on the Internet.

### American Civil Liberties Union ("ACLU")

99.     In addition to its legal advocacy to uphold the Bill of Rights, plaintiff ACLU has long devoted considerable resources to public education about civil liberties. Since 1993, the ACLU public education efforts have included extensive online resources that offer electronic copies of ACLU publications, reports, court briefs, news releases, and other material related to the ACLU's legal, legislative, educational and advocacy work.

100.     The ACLU maintains its extensive online resources through America Online and the Internet's World Wide Web. Some of the ACLU's online resources contain sexual subject matter or nudity. Examples include copies of ACLU court briefs in cases involving arts censorship, obscenity, and discrimination against gays and lesbians.

101.     The ACLU also hosts unmoderated online discussion groups that allow citizens to discuss and debate a variety of civil liberties issues. These services allow online users to express their uncensored views on civil liberties issues and to interact with ACLU staff or featured speakers. Many of the communications in the ACLU's discussion groups have sexual content, for example, a discussion of telephone privacy in the context of Linda Tripp's recordings of conversations with Monica Lewinsky about her alleged affair with President Clinton; a discussion of sexual privacy and state laws on criminal sodomy; and a discussion of the defense of pornography and other erotic expression under the First Amendment.

102.    The ACLU does not moderate its computer communications systems because such editing or censorship would be antithetical to the ACLU's belief in freedom of speech.  Furthermore, the ACLU considers minors to be an important audience for its online resources.  The ability of minors to participate in chat rooms or discussion groups with other minors and with adults is a vital part of their education.  It is particularly important that minors be able to access information about their rights and to learn about and debate controversial issues.

103.    In addition to its own online resources, ACLU staff and members use other online services such as e-mail, outside discussion groups, and online mailing lists as an important low-cost method of communicating and sharing documents and information with each other and with those outside of the ACLU.  Some of this material also discusses nudity or sexual conduct, such as descriptions of the human body or human reproduction.

104.    If the New Provision is not enjoined, the ACLU would be compelled either to refrain from offering constitutionally protected civil liberties materials and from sponsoring constitutionally protected political debates or to face potential criminal prosecution.

**Mark Amerika of ALT-X**

105.    Plaintiff Mark Amerika of ALT-X is the author of two novels as well as the founder and publisher of ALT-X, a critically acclaimed Internet-based clearinghouse for progressive and experimental writing.  Since 1993, ALT-X has provided an online forum for fiction and criticism; interviews and dialogues between artists, activists and correspondents; and new forms of art in the emerging culture of the World Wide Web.

106.    Some of the materials made available through ALT-X contain nudity or sexual conduct.  For example, Shelly Jackson's "My Body" is a contemporary work that blends fiction, autobiography, and confession with nude self-portraiture.  In addition, the site contains information

30

about Mr. Amerika's novels *The Kafka Chronicles* and *Sexual Blood*. Finally, the GRAMMATRON Project is one of the first novel length works of fiction to be published on the Internet. Containing over 1,000 screens of text woven together with 1,700 links, some of the scenes contain sexual conduct.

107.   If the New Provision is not enjoined, Mr. Amerika would be forced either to risk criminal prosecution for providing constitutionally protected expression on ALT-X, or to remove all of the art and literature on the site that contains nudity or sexual content.

### Art on the Net

108.   Plaintiff Art on the Net ("art.net") believes that the World Wide Web provides a unique and low-cost opportunity to artists to exhibit their work to the world. Over 125 international artists curate and maintain their own online studio or gallery spaces on the Art on the Net Web site; the site contains over 38,500 separate files. Artists may join the Art on the Net site by paying a small annual fee and committing to donate one piece of their art to the site. The Art on the Net site is accessed 75,000-100,000 times each day by approximately 3,000-4,500 people. This often leads to art purchases or to off-line shows and exhibits for the artists on Art on the Net.

109.   Some of the art exhibited through Art on the Net depicts nude and sexual images. Currently, at least twenty percent of the artists on Art on the Net work with the human form and display works that involve nudity. Most of the art hosted by Art on the Net is fine art, and the nude figure is commonly found in works of fine art.

110.   For example, Michael Betancourt's studio includes a series of photographs that use assemblages of male and female body parts, including nude images, sexual organs and graphic sexual activity, to create abstract landscapes (related to the work of Salvador Dali and Hans Bellmer). In a discussion of the images on a USENET newsgroup, some Internet users found Betancourt's

photographs to be "pornographic." Diane Fenster also maintains a studio of digital photography on the Art on the Net site featuring "Two Running Rails of Mercury," which depicts a supine nude woman blending into railroad tracks against the background of a small town. This piece was one of three works from Fenster's "A Ritual of Abandonment" series that were removed from a Baltimore corporate exhibit because they contained images that were perceived to be sexually graphic. In addition, Arabella Decker is a sculptress on Art on the Net who is currently showing "The Adam and Eve" series of prints which depict nude figures. Her sculptured works "Good-by Mr. A." and "Blue Lade" also show human nudity.

111.    Art on the Net also features some poets who use sexual themes in their poetry. Sylvia Chong's poetry has sexually oriented themes and metaphors, and Michael West's poetry section entitled "Raw" consists of works that explicitly refer to oral sex.

112.    In addition to providing galleries and studios, Art on the Net provides a range of other services to its member artists. The Web site posts schedules of art events and has links to other art-related sites including artist resources, museums, and exhibits. Art on the Net also hosts mailing lists for different artistic communities on relevant events and issues; these mailing lists include artists who are not members of Art on the Net.

113.    Because of the size and constantly changing nature of its site, Art on the Net cannot self-censor the artists' content on the site by continually reviewing it in order to remove potentially illegal material under the New Provision. Thus, if the New Provision is not enjoined, Art on the Net would have to shut down its site on the Internet entirely, or risk criminal prosecution for providing constitutionally protected artistic expression.

**Feminist.com**

114.    Plaintiff Feminist.com was founded in 1995 for the purpose of using the Internet to promote awareness, education, activism and empowerment for women.  The Feminist.com Web site is a powerful tool for networking on women's issues, from politics and business to art and health. The site is accessed approximately 18,000 times a day.

115.    Feminist.com contain contains extensive, searchable lists of women's resources, from women-owned businesses to services such as eating disorder treatment centers, battered women's shelters, and AIDS information and testing.  Feminist.com also includes a feminist "Outrage of the Month" column, which has included articles on issues such as child brides and harassment of women in the army.  Feminist.com also hosts an online advice column called "Ask Amy," in which users can ask questions about issues such as reproductive rights, violence against women, women's history, and sexual harassment.  Some of the materials made available through Feminist.com contain references to nudity or sexual conduct.

116.    Specifically, the women's health issues page includes step-by-step instructions for a monthly do-it-yourself breast cancer exam.  Among the many articles included at the site is a graphic description of female genital mutilation by Fran P. Hosken, entitled *127 Million Girls and Women Mutilated in Africa-Middle East.*  In addition, Feminist.com contains information about V-Day, a celebrity benefit performance that took place on Valentine's Day 1998 to raise money and awareness to stop violence against women and girls.  Actresses including Glenn Close, Whoopi Goldberg and Lily Tomlin performed pieces from Eve Ensler's 1997 Obie Award-winning play, *The Vagina Monologues.*  The monologues are derived from the writer's interviews with 200 women, and range from rape as a weapon in Bosnia to a thirteen year old's initiation into sex.  All of the monologues contain sexual themes.

117.    Feminist.com also hosts Web sites for other women's groups, including Black Women in Sisterhood for Action; Rape, Abuse and Incest National Network (RAINN); and the National Women's Studies Association.   Some of these sites also contain references to nudity or sexual conduct.

118.    If the New Provision is not enjoined, Feminist.com would be forced either to risk criminal prosecution for providing constitutionally protected speech, or to remove all of the materials referring to nudity or sexual conduct.

### Full Circle Books

119.    Plaintiff Full Circle Books is a feminist bookstore that was established in New Mexico in 1973.   Since 1995, the World Wide Web has provided Full Circle Books with a low-cost opportunity to promote the sale of its books, gifts, music and videos, and to provide other information of interest to readers.

120.    The Full Circle Books Web site provides book catalogs on topics such as healing from sexual abuse and domestic violence, lesbian romance, and women and technology.   The catalogs provide annotations about the books, which sometimes contain nudity and sexual conduct.   For example, the catalogs on books dealing with child sexual assault contains descriptions of incest and rape.   The catalog on lesbian titles includes annotations for books such as *The Loving Lesbian*; *Ceremonies of the Heart: Celebrating Lesbian Unions*; and *Too Queer: Essays from a Radical Life*.

121.    Especially given the fact that gays and lesbians have historically been unfairly targeted under other censorship laws, Full Circle Books is fearful that the New Provision will be used to prosecute it and its members for disseminating material online that contains nudity or sexual conduct.

122.    If the New Provision is not enjoined, Full Circle Books would be forced to risk criminal prosecution for providing constitutionally protected speech on the Internet about books that

it routinely sells from its store, or to self-censor its Web site to remove all references to nudity and sexual conduct. This would prevent professionals dealing with sexual abuse and domestic violence, and victims of such abuse, from obtaining access to valuable resources on the Internet.

**OBGYN.net**

123.    Plaintiff OBGYN.net, an extensive online resource on obstetrics, gynecology, and other women's health issues, is advised by a board of respected medical professionals from around the world. OBGYN.net believes that the Internet can close the circle on women's health care by providing a platform for constant interaction between women, health care providers and the medical industry.

124.    OBGYN.net's resources on the World Wide Web include health sections on fertility, menopause, birth and pregnancy, sexuality, raising children, and alternatives to hysterectomy. OBGYN.net also features weekly columns by physicians on issues such as birth defects, endometriosis, vaginal birth after cesarean, side effects from medications, and smoking during pregnancy. Because almost all of OBGYN.net's resources involve reproductive health, they often include explicit discussions of sexual conduct and the female body.

125.    OBGYN.net also includes a section called "The Comfort Zone," in which women exchange stories and advice about their experiences with, for example, pregnancy, breast cancer and hysterectomy. The Comfort Zone includes a woman's narrative account of her breast self-examination and discovery of a breast lump, and a woman's letter about her difficulties after having a hysterectomy, including the inability to have sexual intercourse with her husband due to pain from the surgery.

126.    OBGYN.net also provides online discussion forums where online users can interact with medical professionals. The women's health forum allows online users to post questions about

women's health which are then answered by medical professionals. Users of OBGYN.net can read current postings by others, or search for past postings on particular subjects. Postings have included questions about bleeding after sexual intercourse during pregnancy, breast self-examinations, condom breakage, early miscarriage, vaginal itching, and breastfeeding. In March 1998, over 1600 messages were posted to the women's health forum. OBGYN.net also contains an online discussion forum for medical professionals to share information; over 1,200 messages were posted to the forum in March 1998.

127.    OBGYN.net believes that it is important for minors, particularly teenaged girls, to have access to the resources on its Web site. Girls begin menstruating as early as age ten, and many teenaged girls are sexually active. Having access to information about gynecological health may help prevent teen pregnancies and slow the spread of sexually transmitted diseases. Many girls may be too embarrassed or shy to ask their family doctors about gynecological health issues; OBGYN.net provides young women with the ability to access important information about their health anonymously.

128.    If the New Provision is not enjoined, OBGYN.net would be forced risk criminal liability because it does not want to self-censor the valuable speech about women's health that it currently makes available over the Internet.

### Santa Fe Online

129.    Santa Fe Online is an access provider and content provider on the Internet. As an access provider, Santa Fe Online fears that it is at risk of prosecution under the New Provision for assisting others in disseminating material that depicts nudity or sexual conduct. As a content provider, Santa Fe Online fears that it may be prosecuted under the New Provision for content on its Web site or the Web sites it hosts. In addition, Santa Fe Online subscribers fear

36

criminal liability for content that they communicate through e-mail, online discussion groups, chat rooms, and on the World Wide Web that contains nudity or sexual conduct.

130.    Santa Fe Online has its own site on the World Wide Web which offers a variety of resources about New Mexico.  For example, the Santa Fe Online Art Gallery contains Web pages with works by local painters, sculptors and photographers.  Some of the art exhibited through the gallery includes nude images such as Una Hanbury's "Dance in the Wind," which portrays two nude figures engaged in a dance, and Tony Vinella's "Nude," a photograph that depicts a nude woman gazing out of her window.  Santa Fe Online's Art Gallery also contains listings of upcoming art shows and events in the Santa Fe area, information on where to take art seminars, tips for collectors, and links to other sites of interest to artists and art aficionados.

131.    Santa Fe Online also hosts an online bookstore featuring books about New Mexico. The site contains Judith Rafaela's collection of poetry, *Poems Along the Path*, and a novel by Frances Salas entitled *It'll Be Upon You Like a Thief in the Night*, both of which contain sexual themes.

132.    If the New Provision is not enjoined, Santa Fe Online would be forced to choose between risking criminal prosecution for providing constitutionally protected expression, or self-censoring of all communications that depict nudity or sexual conduct.

### Sexual Health Institute

133.    The material available through the Sexual Health Web Page will necessarily involve references to sexual conduct.  The Web site will include the quarterly Sex Therapy Update newsletter, with articles about issues such as the impact of different medications on sexual functioning, and tips for parents on how to talk to their children about sexuality.

134.    The site will also feature an advice column in which users can obtain answers to their explicit questions about sexual problems, or review an index of past questions.  In addition, the site

will provide tips on how to choose a sex therapist, including what questions to ask a therapist, what type of homework the therapist assigns, and what type of license the therapist holds.

135.   For a fee, visitors to the Web site will also have the option to fill out and submit a detailed questionnaire designed to provide an in depth assessment of sexual problems.   This questionnaire contains frank and explicit  language about sexual attitudes and practices.   Thus, in addition to providing free information and advice on sexual health, the Web site will provide a low-cost method of advertising the services of the Sexual Health Institute.

136.   If the New Provision is not enjoined, the Sexual Health Institute would be obliged either to risk criminal prosecution for providing constitutionally protected speech about sexual education and treatment, or to deprive adult Internet users of access to this important information.

**Stop Prisoner Rape**

137.   Stop Prisoner Rape is a non-profit organization that provides education, information, and advocacy at all levels regarding sexual assault in the nation's prisons, jails and juvenile institutions.   Stop Prisoner Rape provides encouragement and advice to survivors, as well as counseling and other support.

138.   As part of its education and information campaign, Stop Prisoner Rape maintains a site on the World Wide Web that relates the experience of prisoners who have been raped, offers advice, and provides information to the general public on the issue of prisoner rape.  Stop Prisoner Rape makes information available to anyone who accesses its site.  As of April 12, 1998, the Stop Prisoner Rape Web site contained over six megabytes of content.

139.   The Stop Prisoner Rape Web site contains a variety of textual and graphical documents concerning prisoner rape.  It also links to other Web sites relevant to the problem of prisoner rape such as the Federal Bureau of Prisons, the National Institute of Corrections, the

American Bar Association, magazine articles, and scholarly texts. The sites that the Stop Prisoner Rape Web site are linked to are in turn linked to other sites. It would be infeasible for Stop Prisoner Rape to screen this virtually endless chain of links for material that might be considered to depict "nudity" or other "sexual conduct."

140.    Information provided by Stop Prisoner Rape on its Web site is necessarily graphic and sexually explicit. Discussing the issue of rape, especially in the unique sexual environment constituted by single-gender confinement institutions, without discussing sex is nearly impossible. Thus, the Stop Prisoner Rape Web site contains uncensored prisoner accounts of rape. The language used by prisoners in these accounts is raw, employs street language, and explicitly discusses violence, sex and certain excretory functions used to humiliate victims. Stop Prisoner Rape believes that the prisoners' accounts are extremely important in educating the general public because they convey the horrible realities of prisoner rape in ways that no statistics can ever hope to do. In addition, the prisoner testimonials  offer counsel to other prisoners who are rape survivors. Censoring the content to remove all explicit references to sex and violence denies these prisoners a forum to discuss their experiences. The language must address the undereducated characteristics of the bulk of potential prisoners if Stop Prisoner Rape's purpose of warning potential targets is to be fulfilled. The Stop Prisoner Rape Web site also offers advice to prisoners on surviving rape and sexual slavery, and minimizing the risk of getting AIDS. This advice is necessarily written in a language style that will reach the wide range of the prison population.

141.    The risk of contracting AIDS in prison as a result of rape is very real and has been termed a "critical issue" in a letter to Stop Prisoner Rape by one of the nation's foremost public official on AIDS, Patricia S. Fleming, a National AIDS Policy Director. Stop Prisoner Rape believes

that its education and outreach campaign saves lives by offering realistic advice to prisoners on safer sex.

142.    Stop Prisoner Rape also provides extensive information of a similar type to the general public by using electronic mail and by posting information to online discussion groups and chat rooms.

143.    While some of the material on the Stop Prisoner Rape Web site may be viewed by others as inappropriate for young children, it is important that the material reach older minors. According to numerous studies and a consensus of the literature on this subject, the younger the prisoner, the more likely he is to be targeted for rape behind bars. Therefore, if there is any audience most in need of warning and avoidance advice, it is precisely these minors old enough to be at risk of incarceration.  Stop Prisoner Rape believes that juvenile incarceration institutions are the worst sites for sexual victimization and that it is in these juvenile institutions that males learn the social structure that not only makes possible but encourages rape as a regular and routine practice behind bars.  In short, Stop Prisoner Rape's organizational objective of stopping prisoner rape cannot be fulfilled without addressing minors.

144.    If the New Provision is not enjoined, Stop Prisoner Rape would be obliged either to risk criminal prosecution for providing constitutionally protected speech or would have to eliminate all references to sex and violence on its Web site, leaving a relatively empty site.  Stop Prisoner Rape believes that the New Provision would greatly cripple its ability to discuss prison rape in a manner that prisoners and former prisoners could both understand and apply to their lives.  Likewise, the ability of Stop Prisoner Rape to convey the full brutality of prisoner rape to the general public would be severely compromised.

### Jeff Walsh of Oasis Magazine

145.    Plaintiff Oasis Magazine was started in December 1995 as a resource for gay, lesbian, bisexual and transgendered youth. A California-based online magazine, Oasis Magazine depends on feedback and submissions from its readers, and features over fifty young columnists who range in age from fourteen to twenty-five. Oasis Magazine serves as an educational resource and creative outlet to the over 35,000 visitors each month.

146.    Oasis Magazine contains material of interest to the gay and lesbian youth community, including some material that depicts sexual conduct or nudity. Each issue provides a forum through which columnists can discuss important events in their lives. In a recent article entitled *A Whole New World*, the author describes the process of coming out to his friends and family. Readers are also encouraged to submit poetry or short stories. *San Andreas Fault* deals with a young boy's discovery that his best friend is gay while David Wycislak's *Right Now* explores sexual awakening. A Canadian Oasis writer, Simon Thibault, has recently been using artistic nude images of himself as part of his emotional, self-exploring Web essays.

147.    In addition to providing a forum for original writing, Oasis Magazine provides a range of informational services. At times these services contain references to sexual behavior. For example, a recent survey conducted on the opinions and experiences of gay and questioning youth included questions about sexual practices. Additionally, Oasis Magazine runs a monthly advice column in which readers can have their questions answered by Katherine Fordham, a pediatrician who has been recognized for her work in AIDS education and prevention. Often these columns contain frank discussions of risky behaviors among the youth while providing useful information on health issues including sexual health education.

148.    Minors are the primary target audience for -- as well as the primary contributors to -- Oasis Magazine.  Thus, Oasis Magazine does not want to restrict minors from having access to its site.  Many gay and lesbian teenagers are struggling with feelings of confusion and isolation.  For many of these young people, Oasis is their only source of peer support.  In addition, Oasis provides reliable information to many straight youth
who have questions about homosexuality.

149.    If the New Provision is not enjoined, Oasis Magazine would be obliged to either risk criminal prosecution or to stop providing access to constitutionally protected expression in the form of stories, advice columns,  and news which serve as a source of support and reassurance to a traditionally underserved community.

### American Booksellers Foundation for Free Expression ("ABFFE")

150.    Plaintiff ABFFE has hundreds of bookseller members from coast to coast, as well as in the State of New Mexico, many of whom sell materials that contain nudity or descriptions of the nude human body, and which deal frankly with the subject of human sexuality.  ABFFE's members are not "adult bookstores."  Some member bookstores have their own Web pages that discuss the content of books sold in stores.  Most member bookstores use the Internet and electronic communications to obtain information and excerpts of books from publishers.  For example, member booksellers may review current popular titles such as *Primary Colors* by Anonymous and *Sabbath's Theatre* by Philip Roth, which include passages describing nudity and sexual conduct.

151.    ABFFE members' right to learn about, acquire, and distribute materials containing nudity and sexual conduct, and their patrons' right to purchase such materials, would be seriously infringed by the New Provision if it is not enjoined because ABFFE members and the publishers with

which they transact business would be forced to self-censor or risk prosecution under the New Provision.

### Association of American Publishers, Inc. ("AAP")

152.   Plaintiff AAP sues on behalf of its members who are content providers and users of the Internet.  Although their business is primarily based on print publishing, AAP's members are very actively involved in the Internet.  AAP's members create electronic products to accompany and supplement their printed books and journals; create custom educational material on the Internet; communicate with authors and others, receiving manuscripts, and editing, typesetting, and designing books electronically; transmit finished product to licensed end-user customers; communicate with bookstores and other wholesale and retail accounts; and promote authors and titles online.

153.   Many of AAP's members have Web sites and provide information to the world on the Internet.  Some of the content provided by AAP's members contains nudity or sexual conduct.  Many of the efforts to ban books in various communities have been directed at books published by AAP's members, and AAP fears that the New Provision will spawn similar efforts directed at AAP's online publishing.  If the New Provision is not enjoined, AAP members would be forced either to risk criminal liability or stop providing online access to constitutionally protected books and other related materials.

### Electronic Frontier Foundation ("EFF")

154.   Since its inception in 1990, EFF has used the Internet to educate the public about civil liberties and legal issues as they arise in cyberspace.  EFF's public education efforts include the maintaining of extensive online resources on the World Wide Web.  These resources include articles, court cases, legal papers, news releases, newsletters, and excerpts from public discussions related to the EFF's legal, legislative, educational, and advocacy work.  EFF's Web page normally receives

43

between 142,000 to 238,000 hits per day (a hit is an instance of individual access).  The site normally transmits the equivalent of 120 million to 140 million words per day.

155.    EFF also maintains eight online mailing lists, both for specific civil-liberties and activist activities, and for informing the public about its activities.  The primary mailing list has a subscriber base of approximately 6,700 individuals.

156.    Some of the material that EFF communicates over the Internet contains nudity or sexual conduct.  For example, in the EFF Censorship Archives, there are several articles relating to the Marty Rimm (Carnegie Mellon) study on pornography.  Critiques of Marty Rimm's methods occasionally include a depiction of nudity or sexual intercourse taken from the study to show its flaws.  The Legal Cases Archives contains the story that Michigan University student Jake Baker wrote online that depicts the sexual torture and killing of another student.  It contains descriptions of nudity, rape, sexual torture and murder.  It is archived here so that visitors can understand what the case was about.

157.    EFF believes it is important for minors to be able to educate themselves about the legal and constitutional structures that frame freedom of speech online.  Some EFF members are minors.  This New Provision would radically restrict access by EFF members who are minors to constitutionally protected material that they could legally be given in a library or bookstore.

158.    Nearly all of EFF's approximately 2,000 members use online communications.  EFF members both receive and transmit information through a variety of online communications.  Because nudity and sexual conduct are part of the human experience, inevitably some of EFF's members use the Internet to communicate about those topics.

159.   If the New Provision is not enjoined, EFF and its members would be compelled either to refrain from communicating constitutionally protected speech or face potential criminal prosecution.

### Freedom to Read Foundation, Inc. ("FTRF")

160.   Plaintiff Freedom to Read Foundation, Inc ("FTRF") and its library members serve as both access and content providers on the Internet.  Because the Internet offers their patrons a unique opportunity to access information for free, many libraries provide their patrons with facilities that patrons can use to access the Internet.  Many libraries also have their own World Wide Web sites on the Internet and use the Internet to post card catalogues, post information about current events, sponsor chat rooms, provide textual information or art, or post online versions of materials from their library collections.  Patrons can, for example, access the Web site of certain libraries from anywhere in the country to peruse the libraries' card catalogues, review an encyclopedia reference, or check a definition in the dictionary.

161.   Some of the materials provided or made available by libraries contain nudity or sexual conduct.  For example, FTRF member libraries' online card catalogues include such works as *Forever* by Judy Blume, *Women on Top* by Nancy Friday, *Changing Bodies, Changing Lives* by Ruth Bell, *Our Bodies, Our Selves* by the Boston Women's Health Collective and *It's Perfectly Normal* by Robie Harris.

162.   If the New Provision is not enjoined, libraries would be inhibited from both posting and providing access to materials on the Internet that contain nudity or sexual conduct.  Adult library patrons and Internet users would thus be deprived of access to these constitutionally protected library materials.  Given the global and unrestricted nature of the Internet and the past attempts by persons to ban literature and reference items from library collections, many of FTRF's members may choose

not to post a substantial amount of expressive material at all -- material that many adults might consider useful for themselves or their own children -- rather than risk prosecution for posting material that might be illegal in New Mexico.

### International Periodical Distributors Association ("IPDA")

163.    Members of Plaintiff IPDA distribute or arrange for the distribution of paperback books and periodicals to wholesalers.  Some of these books and periodicals contain nudity and sexually frank material.  Some of these books and periodicals (or portions thereof) are or soon will be published in electronic formats available to the public on the Internet.

164.    Some IPDA members are concerned that the New Provision will impact on their ability to market, promote and thus distribute these works.

### New Mexico Library Association ("NMLA")

165.    Plaintiff NMLA and its members acknowledge that the Internet provides a unique and far reaching means for libraries to make information available to the public.  Currently, at least eighty-five percent of NMLA member libraries provide Internet access terminals for public use.  If not enjoined, the New Provision would have a chilling effect on the basic mission of NMLA's members: to maintain the confidentiality of the user while providing access to a diverse range of information and resources.  The New Provision would impede NMLA's member libraries from providing information to patrons on a confidential basis by requiring that libraries verify identification or some other proof of adult status before allowing a patron using library facilities to access information over the Internet that contains nudity or sexual conduct.

166.    The diverse information provided or made available by NMLA's members over the Internet contains some material that contains nudity or sexual conduct.  For example, member patrons could use library-provided facilities to access a sexually oriented article about rap artists Dr. Dre and

Snoop Doggy Dog from *Rolling Stone* magazine and an *Elle* magazine article regarding biological explanations for women's sexual infidelity.

167.    If the New Provision is not enjoined, it would force NMLA's member libraries to avoid providing valuable information containing nudity or sexual conduct on the Internet and to stop providing Internet access to their patrons or otherwise risk criminal prosecution under the New Provision.   Library patrons and Internet users would thus be denied access to constitutionally protected library materials because of the New Provision's chilling effect on free speech.

### PEN American Center ("PEN")

168.    In addition to its program and membership activities, PEN maintains a Web site devoted to public education and information about free expression and literature.   Its site gives visibility and exposure to PEN activities, including its Freedom-to-Write appeals against literary censorship.   Some of these cases have involved writing that contains literary treatment of sexuality, sexual conduct or sexual themes.   For example, one of PEN's members, A.E. Homes, is encountering censorship problems in Europe with her novel *The End of Alice* which deals with pedophilia.   PEN's appeal on her behalf (now in its draft stage) includes sexually descriptive references and excerpts from the novel.   PEN also uses its Web site to publicize events such as a recent panel discussion on *Intolerance in Sex* (February 1998,) a potential screening of the film *Lolita* (which has not been picked up by any American distributor, despite an academy award winning cast and wide European distribution,) or a forthcoming event on *20th Century American Literary Censorship of Sex* (late 1998.)   Any of these promotional announcements on the PEN Web site are likely to include descriptive content.

169.    In addition to its own Web site, PEN staff and members use other online services such as e-mail, outside discussion groups, and online mailing lists as an important low-cost method of

communicating and sharing documents and information with each other and with those outside of the PEN. Some of this material contains depictions of nudity or sexual conduct, as in the descriptions of censored art such as the Jock Sturges photography book. Furthermore, PEN members are the authors, editors and translators of some of the most acclaimed literary works of the century, many of which include sexually descriptive content. Among those whose work includes sexually descriptive material are such high profile members as Norman Mailer, Philip Roth, Mary Gordon, Maya Angelou, John Updike, Anne Rice, John Cunningham, John Berant and countless others. As a membership organization, PEN serves to protect its members' rights to communicate their writing, through print and electronic means.

170.    If the New Provision is not enjoined, PEN would be compelled either to refrain from offering constitutionally protected literature and free speech material and engaging in professional discussion and advocacy planning with colleagues, or to face potential criminal prosecution.

### Periodical and Book Association of America ("PBAA")

171.    Members of Plaintiff PBAA are publishers of magazines and paperback books, some of which contain nudity and sexually frank materials. Although PBAA's members' business is primarily based on print publishing, some of the books and magazines (or portions thereof) are now or soon will be published in electronic formats available to the public on the Internet.

172.    Some PBAA members are concerned that the New Provision will require them to censor the online version of their print editions. For this reason, PBAA believes that the New Provision imposes unconstitutional press censorship that will substantially limit the Internet's potential to enhance the diversity, availability, timeliness, quality, and utility of magazines and paperback books online by creating a powerful disincentive for publication through the use of interactive media technologies.

48

173.   If the New Provision is not enjoined, PBAA members might be criminally liable for content that contains sexual conduct or nudity if they do not self-censor.

**Publishers Marketing Association ("PMA")**

174.   Members of Plaintiff PMA are publishers of books, some of which contain nudity and sexually frank materials.  Although PMA's members' business is primarily based on print publishing, some of the books (or portions thereof) are now or soon will be published in electronic formats available to the public on the Internet

175.   Some PMA members are concerned that the New Provision will required them to censor the online version of their print editions.  For this reason, PMA believes that the New Provision imposes unconstitutional press censorship that will substantially limit the Internet's potential to enhance the diversity, availability, timeliness, quality, and utility of books online by creating a powerful disincentive for publication through the use of interactive media technologies.

176.   If the New Provision is not enjoined, PMA members might be criminally liable for content that contains sexual conduct or nudity if they do not self-censor.

**Recording Industry Association of America ("RIAA")**

177.   Members of Plaintiff RIAA produce the vast majority of sound recordings in the United States, some of which include sexually frank lyrics.  Some of these recordings (or portions thereof) are available to the public on the Internet.

178.   RIAA members are concerned that the New Provision will require them to censor the online version of their recordings.  For this reason, RIAA believes that the New Provision imposes unconstitutional press censorship that will substantially limit the Internet's potential to enhance the diversity, availability, timeliness, quality, and utility of music online by creating a powerful disincentive for the use of interactive media technologies.

49

179.    If the New Provision is not enjoined, RIAA members might be criminally liable for content that contains sexual conduct or nudity if they do not self-censor.

## CAUSES OF ACTION

### First Cause of Action:
### Violation of Adults' Rights Under the First and Fourteenth Amendments
### of the United States Constitution

180.    Plaintiffs repeat and reallege paragraphs 1-179.

181.    The New Provision violates the First and Fourteenth Amendments of the United States Constitution on its face and as applied because it creates an effective ban on constitutionally protected speech by and to adults.

182.    The New Provision violates the First and Fourteenth Amendments because it is not the least restrictive means of accomplishing any compelling governmental purpose.

183.    The New Provision violates the First and Fourteenth Amendments because it is substantially overbroad.

### Second Cause of Action:
### Violation of Minors' Rights Under the First and Fourteenth Amendments
### of the United States Constitution

184.    Plaintiffs repeat and reallege paragraphs 1-179.

185.   The New Provision violates the First and Fourteenth Amendments of the United States Constitution because it interferes with the rights of minors to access and view material that to them is protected by the First Amendment.

186.    The New Provision is unconstitutional because it prohibits the dissemination to all minors of any material with nudity or sexual conduct, despite the fact that some of the material has value for some minors.

### Third Cause of Action:
### Violation of the Right to Communicate and Access Information Anonymously
### <u>Under the First and Fourteenth Amendments of the United States Constitution</u>

187.   Plaintiffs repeat and reallege paragraphs 1-179.

188.   The New Provision violates the First and Fourteenth Amendment right to communicate and access information anonymously.

### Fourth Cause of Action:
### Vagueness in Violation of the First, Fifth, and Fourteenth Amendments
### <u>of the United States Constitution</u>

189.   Plaintiffs repeat and reallege paragraphs 1-179.

190.   The New Provision is unconstitutionally vague, in violation of the First, Fifth, and Fourteenth Amendments, because it fails to provide definitions of "nudity, sexual intercourse, or any other sexual conduct," and because the New Provision fails to distinguish between material that may be inappropriate for very young minors and material that may be inappropriate for teenagers.

### Fifth Cause of Action:
### Violation of the Commerce Clause
### <u>of the United States Constitution</u>

191.   Plaintiffs repeat and reallege paragraphs 1-179.

192.   The New Provision violates the Commerce Clause because it regulates communications which take place wholly outside of the State of New Mexico.

193.   The New Provision violates the Commerce Clause because it constitutes an unreasonable and undue burden on interstate and foreign commerce.

194.   The New Provision violates the Commerce Clause because it subjects interstate use of the Internet to inconsistent regulations.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs respectfully request that the Court:

A.     Declare that Section 1.A. of 1998 New Mexico Laws, Chapter 64 (to be codified at 30-37-3.2(A)) violates the First, Fifth and Fourteenth Amendments and the Commerce Clause of the United States Constitution;

B.     Preliminarily and permanently enjoin defendants from enforcing that provision;

C.     Award plaintiffs their reasonable costs and fees pursuant to 42 U.S.C. § 1988; and

D.     Grant plaintiffs such other and further relief as the Court deems just and proper.

Respectfully submitted,

Philip B. Davis
Co-Legal Director
AMERICAN CIVIL LIBERTIES UNION OF
     NEW MEXICO
814 Marquette N.W.
Albuquerque, N.M. 87102
(505) 242-1904

Ann Beeson
Christopher A. Hansen
AMERICAN CIVIL LIBERTIES UNION
     FOUNDATION
125 Broad Street
New York, New York 10004
(212) 549-2500

Michael A. Bamberger
SONNENSCHEIN NATH & ROSENTHAL
1221 Avenue of the Americas
New York, New York 10020
(212) 768-6700

Date: April 22, 1998                              Attorneys for Plaintiffs
(c:\cyber\compl.civ)

52